UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| LAWRENCE TRAINOR, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No. 09-CV-10349-RGS |
| v. | ) | |
| | ) | |
| HEI HOSPITALITY, LLC, et al., | ) | |
| | ) | |
| Defendants. | ) | |

---

## MEMORANDUM OF PLAINTIFF IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

---

David Rapaport BBO# 411920
drapaport@davismalm.com
Laurie Alexander-Krom BBO # 637385
lalexander-krom@davismalm.com
Davis, Malm & D'Agostine, P.C.
One Boston Place
Boston, MA 02108
Telephone: (617) 367-2500
Attorneys for the Plaintiff

Dated: March 12, 2010

# TABLE OF CONTENTS

I.     FACTS ........................................................................................................... 1

       ARGUMENT ................................................................................................ 4

II.    SUMMARY JUDGMENT SHOULD BE DENIED ON COUNTS I AND III
       ALLEGING AGE DISCRIMINATION BECAUSE THERE ARE GENUINE
       ISSUES OF MATERIAL FACT IN DISPUTE CONCERNING HEI'S
       ALLEGED REASON FOR TERMINATING MR. TRAINOR ............................. 5

   A.  Defendants Carry A Heavy Burden In Seeking To Have A Case Dismissed On
       Summary Judgment, Particularly In Employment Discrimination Cases Where
       The Ultimate Decision Turns On Issues Of Motive And Intent. ........................... 5

   B.  Mr. Trainor Has Demonstrated A Prima Facie Case, As Required By *Mcdonnell
       Douglas,* And Mr. Trainor Agrees That HEI Has Articulated A Non-
       Discriminatory Reason For His Termination. ....................................................... 6

   C.  HEI's Articulated Reason For Terminating Mr. Trainor, Lack Of Work, Was A
       Pretext For Discrimination Based On His Age. .................................................... 7

       1.   HEI Has Always Continued The Process Of Seeking, Acquiring, And
            Operating Hotel Properties. ......................................................................... 8

       2.   Mr. Trainor's Job Duties Were Reassigned To Younger Employees............ 9

       3.   The Many Ageist Remarks Made By Mr. Trainor's Superior At HEI,
            Combined With The Evidence Of Pretext In Sections 1 And 2 Above,
            Strongly Support Mr. Trainor's Claim........................................................ 10

III.   SUMMARY JUDGMENT SHOULD BE DENIED ON COUNTS II AND IV
       ALLEGING RETALIATION BECAUSE MR. TRAINOR WAS TERMINATED
       WITHIN HOURS OF HIS NOTIFYING HEI THAT HE HAD FILED A
       CHARGE OF DISCRIMINATION WITH THE MCAD. TO THE EXTENT
       THAT HEI ARGUES THAT THERE IS NO CAUSAL CONNECTION
       BETWEEN MR. TRAINOR'S PROTECTED ACTIVITIY AND HIS
       TERMINATION, THIS IS A GENUINE ISSUE OF MATERIAL FACT.......... 13

IV.    THERE ARE MANY DISPUTED ISSUES OF MATERIAL FACT,
       PRECLUDING SUMMARY JUDGMENT FOR HEI. ....................................... 14

V.     THE COURT SHOULD GIVE LITTLE WEIGHT TO LEGAL ARGUMENTS
       AND EVIDENCE MORE PROPERLY CONSIDERED AT TRIAL RATHER
       THAN AT THE SUMMARY JUDGMENT STAGE .......................................... 16

   A.  The so-called "same actor" principle is inapplicable in this case........................ 16

B.    Mr. Trainor is entitled to have a jury determine whether Mr. Mendell terminated
      him for legitimate business reasons or because of his age.................................... 18

      CONCLUSION.................................................................................................... 19

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Anderson v. Liberty Lobby, Inc.*,
 477 U.S. 242 (1986)............................................................................5, 17

*Daley v. Wellpoint Health Networks, Inc.*,
 146 F. Supp. 2d 92 (D. Mass. 2001) ...........................................................6

*Danzer v. Norden Systems, Inc.*,
 151 F.3d 50 (2d Cir. 1998).......................................................................10

*Dominguez-Cruz v. Suttle Caribe, Inc.*,
 202 F.3d 424 (1st Cir. 2000).....................................................................10

*Estes v. Dick Smith Ford, Inc.*,
 856 F.2d 1097 (8th Cir. 1988) ..................................................................18

*Fantini v. Salem State College*,
 557 F.3d 22 (1st Cir. 2009).......................................................................14

*Hidalgo v. Overseas Condado Insurance Agencies, Inc.*,
 120 F.3d 328 (1st Cir. 1997).......................................................................7

*Hodgens v. General Dynamics Corp.*,
 144 F.3d 151 (1st. Cir. 1998)......................................................................5

*Huff v. Uarco, Inc.*,
 122 F.3d 374 (7th Cir. 1997) ....................................................................10

*LeBlanc v. Great American Insurance Co.*,
 6 F.3d 836 (1st Cir. 1993)...................................................................13, 17

*Lust v. Sealy, Inc.*,
 383 F.3d 580 (7th Cir. 2004) ....................................................................11

*McDonnell Douglas Corp. v. Green*,
 411 U.S. 792 (1973)....................................................................................6

*Reeves v. Sanderson Plumbing Products, Inc.*,
 530 U.S. 133 (2000)............................................................................4, 5, 6

*Rhodes v. JPMorgan Chase & Co.*,
 562 F. Supp. 2d 186 (D. Mass. 2008) .....................................................4, 7

*Rodriguez-Torres v. Caribbean Forms,*
   399 F.3d 52 (1st Cir. 2005)..................................................................................7

*Santiago-Ramos v. Centennial P.R. Wireless Corp,*
   217 F.3d 46 (1st Cir. 2000) ........................................................................4, 6, 7, 10

*Smith v. Chrysler Corp.,*
   155 F.3d 799 (6th Cir. 1998) ...........................................................................18

*Straughn v. Delta Air Lines, Inc.,*
   250 F.3d 23 (1st Cir. 2001)...............................................................................10

*Waldron v. SL Industries, Inc.,*
   56 F.3d 491 (3d Cir. 1995)...............................................................................16

## STATE CASES

*Abramian v. President & Fellows of Harvard College,*
   432 Mass. 107 (2000) ........................................................................................6

*Attorney General v. Bailey,*
   386 Mass. 367 (1982), cert. denied *Bailey v. Bellotti*, 459 U.S. 970
   (1982)...............................................................................................................5

*Flesner v. Technical Communications Corp.,*
   410 Mass. 805 (1991) ........................................................................................5

*Rossiter v. International Business Machines Corp.,*
   2005 WL. 2722929 (D. Mass. 2005) ...............................................................6, 7

*Sullivan v. Liberty Mutual Insurance Co.,*
   444 Mass. 34 (2005) ..........................................................................................6

*Weiss v. JP Morgan Chase & Co.,*
   2009 WL 1585279 (2d Cir. 2009)....................................................................18

## I.    FACTS

Plaintiff Lawrence Trainor ("Mr. Trainor") has provided the Court with a detailed Statement of Material Disputed and Undisputed Facts.  ("Pl. SOF"). He will therefore present here only a brief summary of these facts and will refer to them in the Argument Section of this Memorandum by citing to the supporting paragraph numbers of the Statement ("SOF").

Mr. Trainor, an experienced hotel executive, was hired by Defendants ("HEI") as Senior Vice President, Operations to perform various duties. (Pl's SOF at 1-3). His primary function was to transition newly acquired hotels into HEI.  (Pl's SOF 18). Since HEI anticipated when it hired Mr. Trainor that there would be times when the acquisition process slowed down, it decided that there were a number of other jobs he could also do. (Pl's at SOF 13). These secondary functions included problem solving for certain priority hotels, recruiting General Managers for hotels, supervising hotels, and occasionally disposing of hotels. (Pl's SOF at 13, 14).  Mr. Trainor performed these  functions at various time during the entire period of his employment with HEI. Mr. Trainor's primary and secondary duties continued to be performed, but by younger men, after he was terminated for an alleged lack of work. (Pl's SOF at 65, 90, 92-96).

Mr. Trainor lived with his wife in Marshfield, Massachusetts. (Pl's SOF  at 5). HEI was headquartered in Norwalk, Connecticut. (Pl's SOF at 5).  There was no need for Mr. Trainor to live in Connecticut since he spent most of the week traveling, and had no problem commuting to Norwalk on the one or two days a week when he had to attend meetings. (Pl's SOF at 34-39). Furthermore, HEI permitted a number of its senior management to live in different locations around the United States, such as Arizona, North Carolina, Michigan, Georgia. (Pl's SOF at 44). Twice during the course of Mr.

1

Trainor's employment, Gary Mendell, the CEO, had told him there was no need for him to move to Norwalk. (Pl's SOF at 40, 42).

Mr. Trainor had far more experience in the transition and management of hotel acquisitions, and the operation of hotels, than Brian Mayer, a much younger man HEI would later hire as an SVP of a newly-created Region III at HEI. (Pl's SOF at 1, 3, 53). This position would require Mr. Mayer to supervise ten hotel General Managers. (Pl's SOF at 46). Mr. Mayer had never worked in a hotel, never run a hotel, never held the position of General Manager, never had General Managers reporting to him, and never had P&L responsibility. (Pl's SOF at 53). He had never been a Senior Vice President running a Region for a hotel company. (Pl's SOF at 53). His job at Starwoods prior to HEI essentially involved analysis at a corporate level, and he headed up a Six Sigma team. Nevertheless, HEI assigned Mr. Mayer to take over some of Mr. Trainor's job responsibilities, and at a significantly higher compensation level. (Pl's SOF at 55, 90).

In addition to Mr. Mayer, there were two General Managers who were directed to take over Mr. Trainor's transition duties; Bob LaCasse and Rob Morgan. (Pl's SOF at 91). Both had been brought in to HEI by Mr. Trainor who trained them in transitioning hotels. (Pl's SOF at 14). HEI also planned to have Dan Kaplan, another General Manager, assume some of these transition duties. (Pl's SOF at 91). All three of these GMs were significantly younger than Mr. Trainor. (Pl's SOF at 65, 93).

HEI does not dispute that Mr. Trainor was a superior performer. Indeed, HEI says that his performance was so strong that it wanted very much to retain his services after it eliminated his position. Unlike the famous scene in The Godfather, however, HEI made Mr. Trainor an offer it knew he would have to refuse. They told Mr. Trainor that he could

either move to Norwalk, which they knew he did not want to do because of his wife's health, or take a major demotion to General Manager of a hotel, a job he had done fifteen years earlier, with less status and lower compensation.

HEI claims that it had to eliminate Mr. Trainor's position because there was not enough work for him to do. But HEI has never stopped the process of acquiring hotels. (Pl's SOF at 90-96). Before Mr. Trainor joined HEI, during his employment, and after he was terminated, HEI consistently described itself as one of the fastest growing owners and operators of hotels in the United States, always interested in more acquisitions. (Pl's SOF at 7, 51, 52, 62, 67). HEI had already acquired 22 hotels at the time Mr. Trainor was hired, with the goal of ultimately acquiring 80. (Pl's SOF at 12). In 2008, HEI announced that it had raised half a billion dollars to invest in hotels. (Plaintiff's SOF at 51-52).

HEI was doing so well in June, 2008, that it decided to add a third Region to the two it already had (each headed by an SVP of Operations), due to the anticipated growth of its hotel portfolio. (Pl's SOF at 46). In the summer of 2008, HEI told the recruiting firm helping HEI find an SVP for the new Region III that it was one of "the fastest growing hotel investment groups" and that "looking forward, HEI is committed to continued growth, and plans to acquire, develop or operate approximately $500 million annually in hotel real estate." (Pl's SOF at 50, 51).

On November 12, 2008, Mr. Mendell sent out a company-wide email announcing that HEI had hired Brian Mayer to run the newly-formed Region III, and that "we recently established our third investment fund which will enable us to acquire several additional hotels in 2009 and 2010. This growth will be supported by the addition of a

3

third region." (Pl's SOF at 54).  Mr. Mendell issued a Fund III Third Quarter Report to its

investors on November 30, 2008, after it had decided to eliminate Mr. Trainor's job,

which said that the Fund's pipeline of acquisitions had increased considerably. (Pl's SOF

at 67). And a month after Mr. Trainor's termination, Steven Mendell, HEI's Executive

Vice President of Acquisitions and Development, stated that "since we have dry powder

[i.e., funds to invest], we expect to be at the forefront of the acquisition wave, which we

expect to begin in the near future."  (Pl's SOF at 88).

## Argument

There is essentially no dispute in this case that Mr. Trainor has set forth the

required prima facie case, and that HEI has articulated a non-discriminatory reason for

his termination. The argument will, therefore, focus on whether HEI's articulated reason

"is unworthy of credence."  *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133,

143 (2000*)*.  Mr. Trainor can demonstrate this by either showing that HEI's reason (lack

of work) was false, or is unworthy of belief due to "weaknesses, implausibilities,

inconsistencies, incoherencies, or contradictions." *Santiago-Ramos v. Centennial P.R.*

*Wireless Corp*, 217 F.3d 46, 56 (1st Cir. 2000); *Rhodes v. JPMorgan Chase & Co.*, 562

F.Supp.2d 186, 193 (D. Mass. 2008).

Mr. Trainor will demonstrate that HEI's reason for terminating him, lack of work,

was untrue and is permeated with weaknesses, implausibilities, inconsistencies,

incoherencies, or contractions. A jury, therefore, could decide that the reason was a

pretext for unlawful discrimination. *Reeves v. Sanderson Plumbing Products, Inc.*, 530

U.S. at 143; *Santiago-Ramos v. Centennial P.R. Wireless Corp*, 217 F.3d at 56. There

was an ongoing need for the kind of work Mr. Trainor had been doing at HEI. This is

shown by the nature of HEI's business, HEI's many proclamations about its active

4

acquisition program, and the fact that after HEI terminated Mr. Trainor, it divided up his

duties among several much younger and much less experienced managers.

## II.   SUMMARY JUDGMENT SHOULD BE DENIED ON COUNTS I AND III ALLEGING AGE DISCRIMINATION BECAUSE THERE ARE GENUINE ISSUES OF MATERIAL FACT IN DISPUTE CONCERNING HEI'S ALLEGED REASON FOR TERMINATING MR. TRAINOR.

### A.   Defendants carry a heavy burden in seeking to have a case dismissed on summary judgment, particularly in employment discrimination cases where the ultimate decision turns on issues of motive and intent.

In considering a motion for summary judgment, the court should believe all

evidence of the opposing party, and draw all justifiable inferences in his favor. *Anderson*

*v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); *Attorney General v. Bailey*, 386 Mass.

367, 371 (1982), cert. denied *Bailey v. Bellotti*, 459 U.S. 970 (1982). The court "may not

make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing*

*Products, Inc.*, 530 U.S. 133, 150 (2000). The question is not whether the court "thinks

the evidence unmistakably favors one side or the other, but whether a fair-minded jury

could return a verdict for the plaintiff on the evidence presented." *Flesner v. Technical*

*Communications Corp.*, 410 Mass. 805, 809 (1991).  If there is a genuine issue as to even

one material fact (and in this case there are many), the motion must be denied.

Fed.R.Civ.P. 56(c). Mass.R.Civ.P. 56(c).

HEI cannot carry the particularly heavy burden imposed upon employers seeking

summary judgment in discrimination cases. Courts must be "particularly cautious" and

"should use restraint" in considering motions for summary judgment where the issue is

whether the employer's stated non-discriminatory reason is a pretext for discrimination.

*Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 167 (1st. Cir. 1998).

"In cases involving employment discrimination, where elusive concepts such as motive or intent are at issue, summary judgment is not a favored tool." *Santiago-Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 54 (1st Cir. 2000). This is the law in both the First Circuit, and in the Commonwealth of Massachusetts. *Sullivan v. Liberty Mutual Insurance Co.*, 444 Mass. 34, 38 (2005).

**B.      Mr. Trainor has demonstrated a prima facie case, as required by *McDonnell Douglas*, and Mr. Trainor agrees that HEI has articulated a non-discriminatory reason for his termination.**

Under the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) paradigm, once the employee sets forth a prima facie case, and the employer articulates a non-discriminatory reason for the termination, the employee can demonstrate discriminatory animus and survive summary judgment by showing that the articulated reason is untrue, or "unworthy of credence." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 143 (2000).

The extent to which there is any difference between the federal and the Massachusetts standard for proving  the third element of the paradigm was analyzed by this Court in *Daley v. Wellpoint Health Networks, Inc.*, 146 F.Supp.2d 92 (D. Mass. 2001). The Court pointed out that both *Reeves* and *Abramian v. President & Fellows of Harvard College*, 432 Mass. 107, 118 (2000) brought the two jurisdictions essentially together, resulting "in a convergence of the state 'pretext only' and the federal 'pretext plus' standards." *Wellpoint*, 146 F.Supp.2d at 102.

In *Rossiter v. International Business Machines Corp.*, 2005 WL 2722929, * 7 (D. Mass. 2005), Judge Woodlock noted that the Massachusetts courts are friendlier to plaintiffs than are federal courts when an employer seeks summary judgment in an employment case. He stated that in Massachusetts, evidence of pretext alone will prevent

summary judgment. *Id.* at \*7, citing *Abramian*. Mr. Trainor has met his burden under both federal and Massachusetts law.

HEI apparently concedes that Mr. Trainor has proven a prima facie case since nowhere in its Memorandum does it contest this issue. There is no question that Mr. Trainor was over forty years old at the time of the termination, was performing his job at an acceptable level, and suffered an adverse job action. And where HEI had a continuing need for the kind of work he had been performing, HEI cannot defeat the fourth prong of the *McDonnell Douglas* test by claiming to have eliminated his position. *Rodriguez-Torres v. Caribbean Forms*, 399 F.3d 52, 59 (1st Cir. 2005); *Hidalgo v. Overseas Condado Insurance Agencies, Inc.* 120 F.3d 328, 332-33 (1st Cir. 1997).

### C. HEI's articulated reason for terminating Mr. Trainor, lack of work, was a pretext for discrimination based on his age.

HEI's articulated reason for terminating Mr. Trainor – a lack of work for him to do – is untrue. Mr. Trainor will demonstrate this by pointing out the numerous "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in HEI's explanation for the termination. *Santiago-Ramos v. Centennial P.R. Wireless Corp*, 217 F.3d 46, 56 (1st Cir. 2000); *Rhodes v. JPMorgan Chase & Co.*, 562 F.Supp.2d 186, 193 (D. Mass. 2008).

The reason put forth by HEI to justify the termination of Mr. Trainor is completely inconsistent with the facts as they have developed during discovery in this case, and quite implausible. HEI's position is almost as extreme as that of a bakery which tells its employees, customers, and investors that it is actively continuing to bake and sell bread, but then fires its 61 year-old baker on the grounds that there is no more work for him to do.

7

1.    HEI has always continued the process of seeking, acquiring, and operating hotel properties.

HEI has developed a business model which brought it great success over the years. It obtains money from investors, seeks hotel properties, acquires these hotels, transitions them into the HEI system, and then operates them. HEI followed this model before it hired Mr. Trainor, during his employment, and after it terminated him.

When HEI hired Mr. Trainor, it understood that there would be fluctuations in the pace of the transition work. It specifically planned that when transitions were slower, there would be other work for Mr. Trainor to do. Thus, in addition to the transition phase, Mr. Trainor helped HEI with the acquisition process and the operation process. There is no evidence in this case that either the transition work or the other tasks "went away," such as might be the case if HEI had changed the kind of business it was in, or shut down most of its 30 hotels. All that occurred was a temporary slowdown in the pace of the acquisitions.

During the entire period of Mr. Trainor's employment, HEI bragged that it was one of the fastest growing hotel companies in the country. In 2008, Mr. Trainor's last year of employment, HEI announced that it had raised half a billion dollars of funds to invest in the acquisition of more hotels. Based on its expansion plans, HEI added a new Region in 2008 and decided to give its new Regional SVP (Brian Mayer) more money than it had been paying Mr. Trainor. HEI hailed the hire of Mr. Mayer as marking the beginning of a new growth period in the HEI portfolio. And even though the national economy was not doing well in late 2008, the top executives at HEI saw this as a unique opportunity to acquire hotels at distressed prices.

8

These statements and actions come from HEI itself. In light of what HEI was telling its employees, investors, and people looking to sell hotels, it is completely inconsistent and contradictory for them to be telling the jury that there was not enough work for Mr. Trainor to do or enough money to pay him.

    2.    <u>Mr. Trainor's job duties were reassigned to younger employees</u>

As further proof that Mr. Trainor's job duties did not "go away," they were assigned to younger employees. At the time HEI was getting rid of Mr. Trainor, it decided to pay Bob LaCasse, age 43, GM of Le Meridien in San Francisco, more money if he would assume additional duties as Area Manager, Hotel Transitions. (Plaintiff's SOF at 65). These duties involved exactly the kind of work Mr. Trainor had been doing; in fact, he had trained Mr. LaCasse. HEI also assigned Area Manager duties to Rob Morgan, age 49, GM of the Equinox in Vermont, another younger manager Mr. Trainor had brought to HEI and mentored. (Plaintiff's SOF at 93).

According to Mr. Darnall, the COO, HEI intended to have yet a third GM, Dan Kaplan, in St. Louis, perform transition work. HEI even involved an outside consultant, Alan Kramme, in doing acquisitions/transitions. And Brian Mayer, the new 38 year-old SVP of Region III, "took over" several hotels which Mr. Trainor was working on, all of which were still in the transition phase. (Pl's SOF at 90).Considering this evidence, it is implausible in the extreme to believe that Mr. Trainor's job duties simply vanished.

Mr. Trainor was terminated at a time when HEI was actively seeking to acquire new hotels and assigning younger managers to transition work ((his particular expertise) in anticipation of future growth. HEI is free to argue to the jury that this was all coincidental, but Mr. Trainor has certainly cast sufficient doubt on the ostensible reason for his termination to survive a motion for summary judgment.

3.   The many ageist remarks made by Mr. Trainor's superior at HEI, combined with the evidence of pretext in Sections 1 and 2 above, strongly support Mr. Trainor's claim.

There has been a good deal of litigation over whether discriminatory comments are mere "stray remarks" to be disregarded (almost always the employer's position) or actual evidence of discrimination. There is no question, however that discriminatory comments, in combination with other evidence, may be considered by the jury as bearing on the issue of pretext. *Straughn v. Delta Air Lines, Inc.*, 250 F.3d 23, 36 (1st Cir. 2001); *Huff v. Uarco, Inc.*, 122 F.3d 374, 385 (7th Cir. 1997).

Even where the ageist comments are not made by a decision maker or one who is in a position to influence the decision, the court and the jury may consider the comments as reflecting the "company's general atmosphere of discrimination" and evidence that the employer's explanation for the termination was pretextual. *Santiago-Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 55-56 (1st Cir. 2000). The court could and should consider these comments at the summary judgment stage. *Dominguez-Cruz v. Suttle Caribe, Inc.*, 202 F.3d 424, 433 (1st Cir. 2000) (summary judgment reversed; improper for trial court to dismiss such statements as "stray remarks").

The remarks assume increased force if they are made either by the decision maker or someone in a position to influence the decision maker. *Straughn v. Delta Airlines, Inc.* 250 F.3d 23, 35 (1st Cir. 2001). *See Danzer v. Norden Systems, Inc.*, 151 F3d 50, 56 (2d Cir. 1998) ("When…other indicia of discrimination are properly presented, the remarks can no longer be deemed "stray," and the jury has a right to conclude that they bear a more ominous significance.", reversing summary judgment).

The comments set forth below were made by Mr. Darnall, the COO, who was definitely someone in a position to influence the decision maker. Mr. Darnall was Mr.

Trainor's supervisor, and reported directly to Gary Mendell, the CEO. It was Mr. Darnall who initiated the discussions in mid-November with Mr. Trainor which led to the termination, he spoke with Mr. Trainor in late November and early December about the General Manager position, and he was in communication with Mr. Mendell on January 2, 2009 between HEI's receipt of the Charge and the termination of Mr. Trainor. (Plaintiff's SOF at 57, 58, 64, 68). Thus, while Mr. Darnall was not the final decision maker, he was in a position to influence Mr. Mendell.[1]

Shortly after HEI hired Mr. Trainor, there was a meeting at the Fort Lauderdale Renaissance where Mr. Darnall publicly made the statement that "we're a very young company, that is, except for Larry." (Plaintiff's SOF at 25). Later in the event, Mr. Darnall made the comment: "We are a young company with a bright future, oh, except for Larry." (Plaintiff's SOF at 25). Nigel Hurst, the SVP of Human Relations, and Gary Mendell were present when these comments were made. Neither Mr. Hurst nor Mr. Mendell addressed or took any action in response to Mr. Darnall's comments. (Plaintiff's SOF at 26).

At a meeting in August 2007, at the Sheraton Austin, attended by individuals from the Starwood Corporation, together with people from HEI's corporate department and HEI's hotel management, Mr. Darnall publicly made the comment: "I'm getting too old for this shit, but not as old as Larry; and I can say that because I'm in the same protected class." (Plaintiff's SOF at 27).

---

[1] There is an interesting possibility in this case that Mr. Mendell instructed Mr. Darnall to offer Mr. Trainor the Regional SVP position in Norwalk but that Mr. Darnall did not do so. Under the so-called "cat's paw" theory, the prejudice of the subordinate (Mr. Darnall) could be imputed to the decision maker "where the subordinate, by concealing relevant information from the decisionmaking employee or feeding false information to him, is able to influence the decision." *Lust v. Sealy, Inc.*, 383 F.3d 580, 584-585 (7th Cir. 2004).

In August 2008, four months before Mr. Trainor was terminated, there was a meeting held at the Meridien in Cambridge, Massachusetts attended by the same groups of people. Starwoods had a promotion that year where guests would pay a certain rate based on their birth year. Mr. Darnall made the comment: "That's not fair; Larry would have to pay too much." (Plaintiff's SOF at 28).

Mr. Darnall also made a number of age related comments during HEI's staffing meetings. (Pl's SOF at 26). Attendees would review resumes during these meetings and decide which applicants were worth recruiting for a General Manager position. Comments made by Darnall at these meetings included: "we're looking for 30 and 40 year-olds, not 55 to 60 year-olds," "I don't want to become a company of middle-aged white men," and "these people have been recycled." During one meeting, Mr. Darnall commented that an older applicant did not have energy. Nigel Hurst attended these meetings and recalls that Mr. Darnall may have made the comment that "we need to find younger people to develop our culture." At another meeting Mr. Darnall said about Hugh Harper, an employee close to retirement, that HEI needed to get someone younger in the box. (Pl's SOF at 26).

HEI argues that Mr. Darnall's "involvement in and approval of the hiring" of several General Managers who were over 50 as somehow showing that his ageist comments referenced above "are insufficient to support an inference of age discrimination." (Defendants' Memorandum at 15). First, these persons were not comparable to Mr. Trainor since these four were all hired for a much lower-level position than he held, i.e., General Manager. These random hires, chosen for inclusion in the Memorandum by HEI, have no statistical significance. HEI has offered no evidence of all

the hires and terminations involving Mr. Darnall. For all we know, he may have hired

fifty managers under the age of 40 for every one 50 or older, or he could have terminated

managers over 50 far more often than those under 40. In the *LeBlanc* case cited by HEI,

the Court warned about the problems with using statistical evidence to demonstrate points

as a matter of law, and observed that in disparate treatment cases, the central focus is on

how an individual was treated and why, rather than whether a pattern of discrimination

existed. *LeBlanc*, 6 F.3d at 848. If this observation can be applied to evidence offered by

a plaintiff, surely it can be applied to defendants seeking to support their case by pointing

to other hires they made.

**III.   SUMMARY JUDGMENT SHOULD BE DENIED ON COUNTS II AND IV
ALLEGING RETALIATION BECAUSE MR. TRAINOR WAS
TERMINATED WITHIN HOURS OF HIS NOTIFYING HEI THAT HE
HAD FILED A CHARGE OF DISCRIMINATION WITH THE MCAD. TO
THE EXTENT THAT HEI ARGUES THAT THERE IS NO CAUSAL
CONNECTION BETWEEN MR. TRAINOR'S PROTECTED ACTIVITIY
AND HIS TERMINATION, THIS IS A GENUINE ISSUE OF MATERIAL
FACT.**

Mr. Trainor engaged in protected activity on three separate occasions. First, his

attorney wrote a letter to Mr. Mendell, the CEO of HEI, on December 4, 2008 alleging

age discrimination. Mr. Mendell did not respond, or direct any attorney to respond,

because he thought the letter was "preposterous." (Pl. SOF at 70). After two weeks had

gone by, Mr. Trainor's attorney wrote a second letter on December 20, 2008. Mr.

Mendell's reaction to this communication was to become "pissed" at Mr. Trainor because

Mr. Mendell thought he had had a good conversation with him and then got a second

letter from Mr. Trainor's attorney.  (Pl's SOF at 77-78).

It is a fair inference from these facts that Mr. Mendell resented Mr. Trainor's

retaining an attorney to assert his rights against age discrimination. Up to this point, HEI

had not decided to terminate Mr. Trainor, and negotiations were continuing. But the last straw was when Mr. Trainor's attorney filed a Charge of Discrimination at the MCAD on the afternoon of January 2, 2009. Within hours of receiving notice of the Charge, HEI fired Mr. Trainor. The temporal connection is one of the shortest Mr. Trainor's attorney has ever seen in a retaliation case, and certainly raises a factual dispute concerning a causal connection.

To prove a case of retaliation, a plaintiff must demonstrate that he engaged in protected activity, suffered an adverse employment action, and that there was a causal link between the two. *Fantini v. Salem State College*, 557 F.3d 22, 35 (1st Cir. 2009). The filing of a Charge of Discrimination with the MCAD was clearly protected action, *id.* at 36, and there is no dispute that Mr. Trainor was fired.

The firing occurred with a few hours of the filing. (Pl's SOF at 84). The December 29th letter from Mr. Mendell to Mr. Trainor did not state that he would be terminated unless he accepted the latest offer by January 2, 2009, and the letter from Mr. Trainor's attorney to HEI accompanying the Charge expressed Mr. Trainor's continued willingness to discuss the terms of a resolution. (Pl's SOF at 83). It is certainly open to HEI to argue at trial that it decided to terminate Mr. Trainor before it received the MCAD Charge, but this is a disputed issue of material fact which should be resolved by the jury.

## IV. THERE ARE MANY DISPUTED ISSUES OF MATERIAL FACT, PRECLUDING SUMMARY JUDGMENT FOR HEI.

Based on Plaintiff's Response to Defendants Statement of Material Disputed Facts, Plaintiff's Statement of Disputed and Undisputed Material Facts, and the foregoing Memorandum, the following are among the disputed material facts.

1.   Whether Mr. Trainor's job duties were as broad as he testified, or limited to only transition work. This is a critical issue since HEI now seeks to

14

limit Mr. Trainor's job to only working on current transitions, whereas Mr. Trainor worked on pre-transition acquisition matters, transitions, overseeing the management of troubled hotel properties or those which were taking longer to stabilize than anticipated, hiring and training General Managers, and the disposition of hotels.

2.   Whether HEI continued to have a need for the kind of work Mr. Trainor had been performing during the course of his employment after it terminated him. Mr. Trainor maintains that the only aspect of his work which changed during 2008 was that the pace of new acquisitions had slowed, but that this was a normal part of the HEI business cycle, and something which had been anticipated at the time he was hired.

3.   Whether HEI honestly believed that it had no more need for Mr. Trainor's services in late 2008. This factual dispute turns on the motives and state of mind of HEI and Gary Mendell, the CEO. Mr. Trainor has gathered a great deal of evidence from which a jury could infer that such a belief was not reasonable.

4.   Whether Brian Mayer took over various activities previously performed by Mr. Trainor. HEI maintains in its Memorandum that Mr. Mayer did not do any transition work after Mr. Trainor was terminated. Mr. Trainor strongly contests this, and has provided the Court with specific examples of hotels which were still in transition and were taken over from him by Mr. Mayer.

5.   Whether HEI saved any money by terminating Mr. Trainor. HEI claims that it was facing financial difficulties in late 2008 and terminated Mr. Trainor in part because of cost-cutting. But the Operations Department, where Mr. Trainor worked, grew by three employees and HEI paid extra compensation to Bob LaCasse and Rob Morgan for taking on transition work and paid Mr. Mayer, who did transition work, a much more generous compensation package than it had paid Mr. Trainor.

6.   Whether Mr. Darnall made the ageist statements which Mr. Trainor claims to have heard. This is a disputed issue of fact.

7.   The extent of the influence Mr. Darnall had over Mr. Mendell's decision to terminate Mr. Trainor. Mr. Darnall was Mr. Trainor's superior and reported to Mr. Mendell. Under the case law a resolution of this factual issue affects the weight to be given to Mr. Darnall's ageist statements.

8.   Whether Mr. Darnall ever offered Mr. Trainor the position of SVP of a Region if he would move to Norwalk. HEI strongly argues that it offered this position to Mr. Trainor, and he refused to accept it. Mr. Trainor testified that he was never offered and position of a Regional SVP in Norwalk, and that if he had been, he would have accepted the offer.

9.   Whether HEI continued its expansionist approach in 2009, which would have generated work for Mr. Trainor, or ceased these activities. HEI suggests in its Memorandum that it was practically moribund in 2008 and

2009 when in fact it was telling employees, investors, and seller of hotels that it was engaged in a tremendous expansion program and had $1.5 Billion to invest in hotels.

10. Whether there was any business need for Mr. Trainor to move to Norwalk in order to perform his job. Mr. Trainor claims that HEI's insistence that he move to Norwalk in order to avoid termination was an excuse to force him out of the company, since a number of other SVPs were permitted to live in another state, and he had been doing his job very well from Massachusetts.

11. Whether there is a causal connection between Mr. Trainor's protected activities and Mr. Mendell's decision to terminate him at the end of the day on January 2, 2009. HEI argues that it had decided to terminate Mr. Trainor before he engaged in any protected activity. Mr. Trainor says that Mr. Mendell's negative reaction to Mr. Trainor retaining legal counsel and his firing of Mr. Trainor within hours of learning that Mr. Trainor had filed a Charge with the MCAD raise a jury issue as to the causal connection.

As Fed.R.Civ.P. 56(c) mandates, summary judgment must be denied if there is even one material fact in dispute. Here, there are many, and they should be resolved by a jury after hearing the parties' testimony and determining their credibility.

## V. THE COURT SHOULD GIVE LITTLE WEIGHT TO LEGAL ARGUMENTS AND EVIDENCE MORE PROPERLY CONSIDERED AT TRIAL RATHER THAN AT THE SUMMARY JUDGMENT STAGE

HEI has raised certain legal arguments and offered evidence which should more properly be considered by the Court at trial. Although HEI has not placed a great deal of emphasis on these issues, Mr. Trainor wishes to make his opposition clear.

### A. The so-called "same actor" principle is inapplicable in this case.

The so-called "same actor" inference, as applied to motions for summary judgment, was rejected by the Third Circuit in *Waldron v. SL Industries, Inc.*, 56 F.3d 491, 496 (3d Cir. 1995). The Court observed:

> {w]here…the hirer and firer and the same and the discharge occurred soon after the plaintiff was hired, the defendant may of course argue to the fact-finder that it should not find discrimination. But this is simply evidence like any other

> and should not be accorded any presumptive value…it was
> plausible…that Waber would hire Waldron, use his skills
> for a few years while a younger person was being
> "groomed" for his position, then fire Waldron because of
> his age.

Mr. Trainor can make the same argument as in *Waldron*. HEI hired him and used his skills to train younger men like Bob LaCasse and Rob Morgan in handling transitions of new hotels. Mr. Trainor also created a "Playbook" or manual that according to HEI is still used as a basic guide to transitions. Then, when HEI had obtained Mr. Trainor's knowledge, they no longer needed to continue employing a man of his age, 61.

It is a basic principle of summary judgment jurisprudence that the plaintiff is entitled to all reasonable inferences in his favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986). It would be wrong to give the <u>defendant</u> the benefit of the controversial "same actor" theory at the summary judgment stage.

The parties in this case agree that Mr. Mendell made the decision to terminate Mr. Trainor. They disagree, however, on whether it was Mr. Mendell who hired him. Mr. Trainor says that Mr. Darnall brought him to HEI and recommended him to the other executives. HEI has offered no proof that Mr. Mendell played any role in hiring Mr. Trainor other than signing the offer letter which is practically identical to those of the other SVPs being hired at the same time.  Furthermore, Mr. Trainor worked at HEI for more than two years before he was terminated. These two facts distinguish Mr. Trainor's case from *LeBlanc v. Great American Ins. Co.*, 6 F3d 836 (1st Cir. 1993), the only case cited by HEI on this issue.

**B.** **Mr. Trainor is entitled to have a jury determine whether Mr. Mendell terminated him for legitimate business reasons or because of his age.**

HEI attempts to justify the decision to terminate Mr. Trainor on the grounds that the economy was not doing well in late 2008 and it needed to cut costs and reorganize. This is an explanation which may or may not sway a jury, but it should not be accepted without question at the summary judgment stage where all disputed facts and the reasonable inferences must be afforded to the plaintiff. In *Estes v. Dick Smith Ford, Inc.*, 856 F.2d 1097, 1101 (8th Cir. 1988) the Court said:

> The fact that an employer explains a termination in terms of
> business necessity does not, however, prevent a plaintiff
> from critically examining these preferred business reasons
> to test whether the employer is telling the truth.

HEI appears to rely to an extent upon on an alleged "honest belief" by Mr. Mendell that business conditions required him to terminate Mr. Trainor. But the Sixth Circuit, which has considered this so-called "honest belief" theory extensively, has said that any such belief must be "reasonable." *Smith v. Chrysler Corp.*, 155 F.3d 799, 807-08 (6th Cir. 1998). Given the volume of objective evidence produced by Mr. Trainor demonstrating from HEI's own repeated statements during 2008 and early 2009 that it was actively seeking to purchase many new hotels, the "honest belief" claimed by Mr. Mendell is inherently implausible. This issue should be resolved by a jury, after seeing and hearing the witnesses, and not on a paper record.

In a recent Second Circuit decision reversing a grant of summary judgment in an age discrimination case, *Weiss v. JP Morgan Chase & Co.*, 2009 WL 1585279 (2d Cir. 2009), the plaintiff argued that the employer's reasons for terminating him (they had "lost confidence in Weiss") were false. The employer claimed that it did not base the termination decision on his ineffectiveness per se, but rather on its perception of his

ineffectiveness. The employee presented evidence which raised the issue of whether the employer could have credibly believed that his performance warranted termination, and on that basis the court ruled that summary judgment did not lie. Similarly, this Court should not accept Mr. Mendell's subjective assessment that business conditions were the reason he terminated Mr. Trainor; this is a matter for the jury.

### Conclusion

For the reasons stated above, Plaintiff respectfully requests that the Motion for Summary Judgment be denied.

/s/ David Rapaport
David Rapaport BBO# 411920
drapaport@davismalm.com
Laurie Alexander-Krom BBO # 637385
lalexander-krom@davismalm.com
Davis, Malm & D'Agostine, P.C.
One Boston Place
Boston, MA 02108
Telephone: (617) 367-2500
Attorneys for the Plaintiff

Dated: March 12, 2010

### CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing on March 12, 2010

/s/ David Rapaport
David Rapaport, BBO# 411920

19